(No. 32922.—

CORA LOGAN, Appellee, *vs.* CIVIL SERVICE COMMISSION *et al.,* Appellants.

*Opinion filed May 24, 1954.*

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., GEORGE W. SCHWANER, JR., and MARK O. ROBERTS, of counsel,) for appellants.

MICHAEL F. RYAN, of Chicago, (RICHARD F. McPART-LIN, JR., of counsel,) for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The defendants, Civil Service Commission and Department of Public Welfare of the State of Illinois, have appealed directly from a judgment of the circuit court of Union County reversing a decision of the Civil Service Commission discharging plaintiff, Cora Logan, from her position as "Nurse I" in the classified service of the State of Illinois, on the ground that she had insufficient vision to properly perform her duties.

The proceeding for plaintiff's dismissal was instituted by the filing of written charges with the commission by Dr. R. C. Steck, division head of the Anna State Hospital, alleging that psychological examination of Cora Logan revealed some changes in structure and function of personality due to organicity, and that she had insufficient vision to properly perform her duties of administering drugs as a Nurse I. Pursuant to a request by Cora Logan, a hearing was held before an officer of the Illinois Civil Service Commission as provided under the terms of the Civil Service Act. Ill. Rev. Stat. 1953, chap. 24½, par. 14.

From the evidence adduced at that hearing, on May 15, 1952, it appears that Cora Logan was then 67 years of age. She had originally been employed by the State of Illinois as an attendant at various hospitals from 1911 until 1919, and on March 8, 1944, she was reinstated and

was certified as an attendant for the Department of Public Welfare, employed at the Chicago State Hospital. On January 26, 1948, she was reclassified to the position of nursing attendant, and on November 15, 1948, she became a registered nurse. She was transferred to the Anna State Hospital on January 1, 1951, and remained there as a nurse until her suspension on April 4, 1952.

According to the testimony of Dr. Steck, the duties of a registered nurse of plaintiff's classification include measuring and administering drugs and injections, reading and understanding directions, and making medical records. He identified defendant's exhibits of certain typical glass ampules of medication selected at random from the hospital pharmacy, which a Nurse I is required to administer in the performance of her duties. He then explained that a nurse must first examine the ampule to identify its contents, since a great variety of medication is put up in similar type containers, and that she must then extract the medication from it under sterile procedure, which ordinarily involves scoring the neck of the ampule with a small file and drawing up the medicine into the syringe.

He further testified that he had received numerous complaints about plaintiff's professional ability, including one from the clinical director and another from the business manager, and had also personally observed plaintiff reading with difficulty certain hospital forms which she held some 3 or 4 inches from her eyes in a lighted room. He stated that in consequence of those facts he had requested that an eye examination be given plaintiff by a Dr. W. H. Middleton.

According to the testimony and report of Dr. Middleton, an opthalmologist of considerable training and experience, plaintiff had a visual acuity with her glasses of 20/70 in the right eye, and 20/200 in the left eye, which vision the doctor was unable to improve with any lenses or pin-

hole. He explained that 20/70 indicated an impairment of vision representing 36 percent visual loss and 64 percent visual deficiency; and that the 20/200 vision in the left eye represented an 80 percent visual loss, and was tantamount to industrial blindness. His examination further revealed corneal scars and astagmus of both eyes. In his opinion it would be extremely difficult, if not impossible for plaintiff to perform some of the duties required as a Nurse I at the Anna Hospital, and that since the printing on ampules is sometimes quite small she could not safely give medication both from the standpoint of reading the ampule and measuring the amount to be placed in the syringe. He also stated that she would have considerable difficulty reading a thermometer or doctors' orders.

The Department further submitted, in support of the written charges, certain demonstrative evidence consisting of ampules of drugs, some in their original cardboard boxes, which were presented to plaintiff for identification. She was unable to read them without the aid of a magnifying glass which she carried in her purse.

Plaintiff's testimony with reference to the use of the magnifying glass was inconsistent. At one time she stated that she used it occasionally when there was some fine work that she was afraid of, and at another time she said that she used it more for curiosity, and that she carried it on duty only once.

On her own behalf plaintiff presented certain exhibits including glass ampules, 2 ccs. in dimension, which bore some colored markings, and also a larger glass bottle with typewritten directions on the label, all of which she identified without the use of a magnifying glass. On cross-examination she admitted that she had a good idea where those ampules came from, since her sister-in-law was a nurse, however, she had made no arrangements with her to furnish any ampules. She protested that in the quietude of the hospital she had no such difficulty reading.

An attendant who worked under plaintiff's supervision testified on her behalf that he had observed her fill syringes and give injections, but had never noted her having any difficulty with her eyesight. He stated that he had also seen her read reports, and that she did not read them as she did at the hearing.

A supervisory nurse who had known plaintiff ever since she began work at Anna Hospital testified that plaintiff was co-operative and seemed efficient and that there did not appear to be anything unusual about plaintiff's eyes. She related one instance when she had checked the dosage given by plaintiff and found it to be correct. However, she had never seen plaintiff read anything.

Plaintiff's supervisor testified that she had approved plaintiff's last efficiency report, in which plaintiff was rated "good" as to the quality of her work and "very good" as to her ability to work with others. She admitted that plaintiff had not been too good at seeing things at the hearing, but had no complaints about plaintiff's work. She further stated that she had seen plaintiff take temperatures and serve patients special diets, but had not seen her measure or administer drugs.

On the basis of substantially the foregoing evidence the hearing officer determined that just cause existed for plaintiff's discharge and that in the interest of public service her visual acuity made her discharge as a nurse imperative. The conclusions of the hearing officer were approved by the Civil Service Commission, which made certain formal findings. These included: that the duties of a Nurse I require medical injections and medication of patients, involving the reading of directions and the measuring and administering of drugs, hence a Nurse I must be able to read and understand print on medication; that Cora Logan exhibited great difficulty in reading printed matter on Department exhibits, which were specimen ampules picked at random from the drug room at Anna State Hospital, and

that final reading necessitated the use of a magnifying glass, therefore the demonstrative evidence strengthened the Department's evidence that her vision was so impaired that she could not give ampule medications safely; that Cora Logan had a visual acuity of 20/70 in the right eye and 20/200 in the left eye, according to the testimony of an eminently qualified opthalmologist, which signifies that she is industrially blind in the left eye, and only able to perceive at 20 feet what the normal eye can perceive at 70 feet, and that her vision could not be improved. However, the commission found that there was no evidence in support of the charge that there were psychological changes in personality due to organicity.

Plaintiff filed her complaint to review the administrative decision under the terms of the Administrative Review Act, (Ill. Rev. Stat. 1953, chap. 110, pars. 264-279,) and the circuit court of Union County held that the findings and decision of the Civil Service Commission were against the manifest weight of the evidence, and ordered that plaintiff be restored to her status as a Nurse I in the Department of Public Welfare, and the commission and Department have taken a direct appeal therefrom to this court, inasmuch as the State is a party to the proceeding.

The State Civil Service Act provides that no employee in the classified service of the State shall be removed or discharged for a period of more than 30 days except for cause upon written charges. (Ill. Rev. Stat. 1953, chap. 24½, par. 14.) In the instant case the statutory formalities with reference to notice and hearing were properly followed. It is further provided in that act that the provisions of the Administrative Review Act shall govern all proceedings for judicial review of the final decision of the Civil Service Commission. Under the Administrative Review Act the findings of the administrative agency on questions of fact are *prima facie* correct, (Ill. Rev. Stat. 1953, chap. 110, par. 274,) however, they may be reviewed

to determine whether they are supported by the evidence, and may be set aside only if they are against the manifest weight of the evidence. (*Drezner* v. *Civil Service Com.* 398 Ill. 219; *Secaur* v. *Civil Service Com.* 408 Ill. 197; *Harrison* v. *Civil Service Com.* 1 Ill. 2d 137.) Therefore, in determining the propriety of the order of the circuit court it is incumbent upon this court to ascertain whether the findings of the commission were manifestly against the weight of the evidence, as hereinbefore noted.

It is clear that the findings of the commission with reference to the duties of a nurse of plaintiff's classification are uncontroverted in the evidence, which clearly establishes that a Nurse I must be able to read and understand print on medication in order to give medical injections and medication to patients.

The commission's finding pertaining to the impairment of plaintiff's eyesight is supported by the aforementioned testimony of Dr. Middleton, which constitutes the only medical evidence in the record; by the demonstrative evidence of the Department whereby plaintiff could not read the directions or identify the ampules from the hospital drug room without the aid of her magnifying glass, by plaintiff's own admission that she resorted to using the magnifying glass for fine work which she was afraid of, on some occasions; and by the testimony of Dr. Steck, who filed the charges.

Although there is some countervailing evidence offered by plaintiff, including her identification of her own exhibits, and the testimony of persons with whom she worked to the effect that they never noticed her having any difficulty seeing or performing her work, and that her efficiency rating was good; nevertheless, it is not the province of this court under the terms of the Administrative Review Act to reweigh the evidence in the cause. (*Drezner* v. *Civil Service Com.* 398 Ill. 219.) It is patent, therefore, from the review of the evidence herein, that the findings of the

commission that plaintiff's eyesight was insufficient to enable her to safely perform her duties could not possibly be deemed to be manifestly against the weight of the evidence. Hence it was error for the circuit court to set aside those findings of the Civil Service Commission and to restore plaintiff to her status as a Nurse I with the Department of Public Welfare. The judgment of that court should therefore be reversed, and the order of the Civil Service Commission of Illinois reinstated.

*Judgment reversed.*