(No. 34700.—

WILLIAM COHN, Appellee, *vs.* ELBERT S. SMITH, Auditor of Public Accounts, *et al.,* Appellants.

*Opinion filed September 18, 1958.*

LATHAM CASTLE, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, A. ZOLA GROVES, and THEODORE G. MAHERAS, of counsel,) for appellant Elbert S. Smith, Auditor of Public Accounts; and McLAUGHLIN, BUNDESEN & KINSER, ROBERT POLACHEK, and DONALD J. O'BRIEN, all of Chicago, (HARRY L. KINSER, of counsel,) for other appellant.

MARKS, MARKS and KAPLAN, of Chicago, (WILLIAM S. KAPLAN, of counsel,) for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is an administrative review proceeding brought in the circuit court of Cook County by the plaintiff, William Cohn, against the Auditor of Public Accounts and two currency exchanges, defendants, to review an administrative decision of the Auditor denying plaintiff a license to operate

a currency exchange. An appeal is directed to this court from the judgment of the trial court reversing the Auditor's decision, pursuant to the provisions of the Currency Exchange Act.

The proposed currency exchange is to be located at 5304-A South Pulaski Road on Chicago's southwest side in the Motor World Hotel located within an area used for motor freight terminals. The terminal area generally is bounded on the north by Fifty-first Street, on the south by an alley north of Fifty-fourth Street, on the east by South Pulaski Road and on the west by Keeler Avenue. Several truck terminals are located across Pulaski to the east. Residences and business properties surround the terminal area.

Plaintiff's application for a license was referred to a hearing officer who took evidence and concluded that the community or proposed area of operation was being adequately served by the existing exchanges and the ambulatory exchanges operating in the area. The Auditor adopted the recommendation of the hearing officer that the application be denied. Michael Giovanelli, d.b.a. Pulaski-Archer Currency Exchange, and No. 41 Check Exchange, Inc., filed objections and appeared at the hearing, but the latter did not appear in the trial court nor join in this appeal.

It was stipulated by plaintiff and the Auditor that the former has fully complied with and satisfied the requirements of the Community Currency Exchange Act (Ill. Rev. Stat. 1955, chap. 16½, pars. 30 *et seq.,*) with the exception of the applicability to the facts at bar of section 4.1 (par. 34.1) thereof. The sole question involved therefore is whether the determination and decision of the Auditor was contrary to the manifest weight of the evidence.

Two witnesses testified upon behalf of applicant. Arthur E. Nelson stated that 19 motor truck terminals, a number of business places and the Motor World Hotel are located in the terminal area. Most of them were built by him and

he owns and rents many, including the hotel. The latter has 140 rooms and houses a restaurant and a store room in which the proposed community exchange is to be located. Many residences have been recently constructed close to the terminal area. He further testified that approximately 3,000 trucks use the area daily, equally divided between local and out-of-town trucks; that 6,000 to 7,000 are employed, including over-the-road drivers; that about 1,400 to 1,500 people are permanently employed and that there has been a marked increase in the number of people employed and coming into the area since 1955.

The other witness, Fred Kean, testified that he manages the hotel and stores in the area; that the hotel has 135 rooms for rent and accommodates 6,000 to 7,000 guests per month; that many out-of-town drivers request check cashing service from the hotel and restaurant; that he had referred people to one of the existing exchanges but that he had had several complaints; and that on two or three occasions he had been forced to go some distance to a bank to obtain cash.

It appears from the record that two ambulatory exchanges operate in the area. In addition, No. 41 Check Exchange, Inc., and Pulaski-Archer Currency Exchange are located ½ mile and ⅜ mile, respectively, from applicant's proposed location. Each does a substantial business with people connected with the terminals.

Mrs. Rosa Reitz, an objector, is the daughter of the defendant Giovanelli and manages Pulaski-Archer and another exchange owned by her father. She testified that at least 45 per cent of the check cashing business of Pulaski-Archer was from the trucking area. She estimated the net profit for 1955 at $8,600 but could not break it down to show how much of it was attributable to the trucking area. She further estimated that the net profit of $8,725.21 for the year 1956 would have been reduced to $3,000 without

the trucking area business. She stated that in January, 1957, the net profit was $564.71, and that of 2,285 checks cashed for that month 1,020 were from the trucking area.

Allen M. Kite, another objector, operated 12 exchanges, including No. 41 Check Exchange, Inc., a defendant. He testified that No. 41 started in business in May, 1956, that about 25 per cent of its check cashing business is from the trucking area and that the net profit to January 31, 1957, was approximately $3,400 but that figure did not include some expenses absorbed by the central office. George Moran testified that the two ambulatory exchanges each service two of the terminals in the trucking area and that they do a substantial check cashing business therein.

Based upon the evidence, the Auditor concluded that the community or proposed area of operation is being adequately serviced, that the opening of the proposed exchange would greatly reduce the volume of business for the existing exchanges and lessen their financial stability, and that the issuance of a license to applicant would not promote the convenience and advantage of the community. He thereupon denied the application for a license.

Plaintiff urges that the trucking area is a separate community within the meaning of section 4.1 of the act, (Ill. Rev. Stat. 1955, chap. 16½, par. 34.1,) that the Auditor has failed to define the community served by the two existing exchanges and has considered only the convenience of the people residing outside of the immediate terminal area to the detriment of those using the truck terminals. Section 4.1 reads in part: "Upon receipt of an application * * * the Auditor shall investigate the need of the community for the establishment of a community currency exchange at the location specified in the application. 'Community,' as used in this Act, means a locality where there may be or can be available to the people thereof the services of a community currency exchange reasonably accessible to them. If the issuance of a license * * * will not pro-

mote the convenience and advantage of the community in which the business of the applicant is proposed to be conducted, then the application shall be denied."

We do not read into the word "community" the narrow interpretation given to it by plaintiff. The terminal area is surrounded by residences, many of which have been recently constructed and others are in the process of construction. Many of these now are, and others will be, occupied by permanent employees of the terminals. A more reasonable view seems to be that the immediate terminal area together with the adjacent residential area comprise the community. This view is borne out by the fact that the existing currency exchanges operate both within and without the terminal area and a substantial amount of business is done by people using the immediate terminal area. The real question is whether the community, using the word in the broader sense, is adequately serviced by the existing exchanges. The only evidence tending to show a lack is the testimony of Nelson who had about 12 complaints since 1950, but by his own admission these were made largely because he had promised an exchange in his brochure; and by Kean who said that he had "several" complaints of varied nature. It is significant that not one employee, operator, owner, trucker or person, other than the two interested parties, appeared and testified as to the inadequacy of the existing service. We think there was ample evidence to support the Auditor's conclusion that the existing currency exchanges are within the orbit of the community which includes the terminal area and that the existing currency exchanges are reasonably accessible to the persons living and coming into the community.

The Auditor's decision is grounded partly on his finding that the intrusion of the proposed exchange would impair the financial stability of the two nearest exchanges. Plaintiff seriously urges that such a finding is manifestly against the weight of the evidence and, furthermore, that

there is no legal justification or authority for the injection of the financial stability element into the factual determination required to be made by the Auditor. These contentions can best be considered in inverse order.

Section 4.1 provides that an application shall be denied if a proposed exchange does not promote the "convenience" and "advantage" of the community. Plaintiff cites *Gadlin* v. *Auditor of Public Accounts,* 414 Ill. 89, as authority for his statement that financial stability cannot be considered. His theory is that the Auditor is confined to section 4.1 and applications must be considered without regard to the balance of the act. The *Gadlin case* held that section 4.1 was not so vague as to delegate legislative authority to the Auditor but by no means indicated that it should be considered in isolation. On the contrary it was there stated that the provisions of the entire act must be read together.

The General Assembly by section .01 of the act (Ill. Rev. Stat. 1955, chap. 16½, par. 30,) specifically declared that it was in the public interest that the financial stability of currency exchanges be assured. Parenthetically we observe that, contrary to plaintiff's contention, section .01 plainly refers to both community and ambulatory currency exchanges. Certainly financial stability is a factor in which the public has an interest. It would be neither to the public's convenience nor advantage to have weak and financially uncertain exchanges in operation. It is not only the possibility of direct financial loss through insolvency which is contrary to the public interest, as that might be overcome in whole or in part through the operator's bond. It is the further disadvantage of the possibility of having existing exchanges closed because of being crowded to the point of insolvency or their profits decreased to the point of discouraging their continued operation. We are of the opinion that the Auditor may properly consider financial stability of existing exchanges as a factor in the granting or denying of a license.

We next consider the contention that, even though finan-

cial stability be a factor, the record fails to show as a matter of fact that the issuance of a license would impair the stability of the existing exchanges to the point where the Auditor is justified in denying the application. While the proof would hardly justify a finding that either or both of the existing exchanges would become insolvent, the evidence tends to indicate they would be financially impaired.

In considering all of the foregoing contentions, the Administrative Review Act (Ill. Rev. Stat. 1957, chap. 110, par. 264 *et seq.*) imposes quite a different standard from other types of cases. Section 11 thereof (par. 274) provides that the findings and conclusions of the administrative agency on questions of fact shall be *prima facie* true and correct. We have held that the courts are not authorized to reweigh the evidence, and the reviewing court is limited to ascertaining if the findings and decision of an administrative agency or officer are against the manifest weight of the evidence. (*Secaur* v. *Civil Service Com.* 408 Ill. 197; *Logan* v. *Civil Service Com.* 3 Ill.2d 81; *Parker* v. *Department of Registration and Education,* 5 Ill.2d 288.) It is our duty to review an administrative proceeding to see if the findings are against the manifest weight of the evidence. *Drezner* v. *Civil Service Com.* 398 Ill. 219; *Brown Shoe Co.* v. *Gordon,* 405 Ill. 384.

After reviewing the entire record, we conclude that the Auditor's findings and decision are not contrary to the manifest weight of the evidence. The judgment order of the circuit court of Cook County is, accordingly, reversed and the order of the Auditor of Public Accounts is confirmed.

*Judgment reversed; order confirmed.*