[S.F. No. 24252. Mar. 12, 1981.]

THE PEOPLE ex rel. GEORGE DEUKMEJIAN, as Attorney General, etc., Petitioner, v.
EDMUND G. BROWN, JR., as Governor, etc., et al., Respondents; CALIFORNIA STATE EMPLOYEES' ASSOCIATION et al., Interveners.

Counsel

George Deukmejian, Attorney General, Willard A. Shank and N. Eugene Hill, Chief Assistant Attorneys General, L. Stephen Porter and Richard D. Martland, Assistant Attorneys General, Talmadge R. Jones, George J. Roth, Robert Burton, Paul H. Dobson and M. Anthony Soares, Deputy Attorneys General, for Petitioner.

John C. Wakefield, Larry C. Larsen, Gilles Attia, A. J. Weiglein, Roger A. Jeanson, Haas & Najarian, Thomas A. Farr and Rex H. Reed as Amici Curiae on behalf of Petitioner.

Tuttle & Taylor, Raymond C. Fisher, Barbara L. Stocker, Jeffrey M. Hamerling, J. Anthony Kline, Byron S. Georgiou, Barbara T. Stuart, Jerome B. Falk, Jr., Steven L. Mayer, Howard, Prim, Rice, Nemerovski, Canady & Pollak, Barry Winograd, Kristin Jensen, Robert Miller, William P. Smith, Terry Filliman, Gerald Becker and Ronald Blubaugh for Respondents.

Loren E. McMaster, Bernard L. Allamano, Gary P. Reynolds, Richard Lobel, Van Bourg, Allen, Weinberg & Roger, Stewart Weinberg and Robert J. Bezemek for Interveners.

Reich, Adell, Crost & Perry, Hirsch Adell, Charles P. Scully, Donald C. Carroll, Charles P. Scully II, Donald H. Wollett, Ronald Yank, Franklin Silver, Carroll, Burdick & McDonough, Bodkin, McCarthy, Sargent & Smith, Timothy J. Sargent, Kevin W. Horan, Gillin, Jacobson & Wilson, Ralph L. Jacobson and Cynthia T. Podren as Amici Curiae on behalf of Interveners.

Opinion

**MOSK, J.**—Before reaching the merits of this litigation in either this case or the companion case of *Pacific Legal Foundation* v. *Brown* (1981) *post*, page 168 [172 Cal.Rptr. 478, 624 P.2d 1206], we address a motion of the Governor to dismiss the petition of the Attorney General herein.

The chronology of events is significant. The 1977 Legislature adopted a State Employer-Employee Relations Act (SEERA). (Gov. Code,

§§ 3512-3524.) While the Governor had the measure under consideration the then-Attorney General wrote to him under date of September 20, 1977, urging him to sign what he described as "a standard, well-accepted, existing method of resolving labor/management disputes ... a good step forward." Ten days later the Governor signed the measure into law, and it became effective on July 1, 1978.

On January 23, 1979, the Pacific Legal Foundation and the Public Employees Service Association filed in the Court of Appeal an original petition for a writ of mandate to compel the Governor, the Controller, the Public Employment Relations Board, and the State Personnel Board to perform their constitutional and statutory duties without regard to provisions of SEERA, contending the legislation was unconstitutional.

On January 30, 1979, the present Attorney General, acting through two deputies, met with members of the State Personnel Board, which had been served with summons in the Pacific Legal Foundation suit. At the conference the Attorney General, as counsel to the board, outlined the legal posture of the board and described four legal options available to it. This was a classic attorney-client scenario.

At all times up to that point, the Attorney General was by law the designated attorney for the Governor and the State Personnel Board, as well as for the other state officers and agencies involved herein. Government Code section 12511 provides that the "Attorney General has charge, as attorney, of all legal matters in which the State is interested ...." Section 12512 provides that the "Attorney General shall... prosecute or defend all causes to which the State, or any State officer is a party in his official capacity; ..." (See also Gov. Code, § 18656.)

On February 7, 1979, however, the Attorney General initiated the present proceeding by filing an independent petition for writ of mandate in the Court of Appeal against the Governor and other state agencies, asking for relief comparable to that sought by Pacific Legal Foundation.

There is no question that at such time as he believed a potential conflict existed, the Attorney General could, as he did, properly withdraw as counsel for his state clients and authorize them to employ special counsel. (Gov. Code, § 11040; *D'Amico* v. *Board of Medical*

*Examiners* (1974) 11 Cal.3d 1, 15 [112 Cal.Rptr. 786, 520 P.2d 10].) ▮▮▮ The issue then becomes whether the Attorney General may represent clients one day, give them legal advice with regard to pending litigation, withdraw, and then sue the same clients the next day on a purported cause of action arising out of the identical controversy. We can find no constitutional, statutory, or ethical authority for such conduct by the Attorney General.

The rules of professional conduct to guide attorneys in their relationship with clients and former clients are well established and generally understood by all attorneys in this state. Rule 5-102 of the State Bar Rules of Professional Conduct (3B West's Ann. Bus. & Prof. Code (1974 ed., 1980 cum. supp.) foll. § 6076, at p. 92) requires that before an attorney may represent interests adverse to a client, he must obtain his client's consent in writing. For violation of this principle with regard to a *former* client, an attorney has been disciplined by the State Bar. (*Galbraith* v. *The State Bar* (1933) 218 Cal. 329 [23 P.2d 291].) This court declared in *Galbraith* that "the subsequent representation of another against a former client is forbidden not merely when the attorney *will* be called upon to use confidential information obtained in the course of the former employment, but in every case when, by reason of such subsequent employment, he *may* be called upon to use such confidential information." (Italics in original; *id.* at pp. 332-333.)

We took similar disciplinary action in *Hawkins* v. *State Bar* (1979) 23 Cal.3d 622, 629 [153 Cal.Rptr. 234, 591 P.2d 524], despite the attorney's claim that his conflicting relationship with another person arose subsequently to the initial legal consultation with his client. The relationships, we found, "arose contemporaneously"; this is comparable in time span to the chronology here between the Attorney General's legal consultation with the Personnel Board and his filing of a lawsuit against the same board.

Conduct of attorneys has also been discussed in contexts other than State Bar discipline. In *Wutchumna Water Co.* v. *Bailey* (1932) 216 Cal. 564, 573-574 [15 P.2d 505], this court declared that "an attorney is forbidden to do *either* of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any manner in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship." (Italics

added.) While the record here does not reveal whether the Attorney General acquired any knowledge or information from his clients, the prohibition is in the disjunctive: he may not use information *or* "do anything which will injuriously affect his former client." Unquestionably the Attorney General is now acting adversely to the position of his statutory clients, one of which consulted him regarding this specific matter.

In *Grove* v. *Grove Valve & Regulator Co.* (1963) 213 Cal.App.2d 646, 653 [29 Cal.Rptr. 150], the court enjoined an attorney from appearing against his former clients because "there can be no reasonable doubt that Flehr's present employment as attorney for appellant in this action is adverse to the interests of his former clients, since appellant is suing them over matters which are related to and which Flehr became conversant with during the period in which he represented respondents as their attorney." Here, too, the Attorney General is suing former clients over matters that arose during the period when by law he was counsel for those same clients.

To the same effect is *Earl Scheib, Inc.* v. *Superior Court* (1967) 253 Cal.App.2d 703, 706 [61 Cal.Rptr. 386], in which the court declared "The rules which underlie our decision have long been written in the books so that he who runs might read. 'It is the duty of an attorney: . . .(e) To maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client.' (Bus. & Prof. Code, § 6068.) 'A member of the State Bar shall not accept employment adverse to a client or former client, without the consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client.'" (See also *Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788].)

In *State of Ark.* v. *Dean Foods Products Co., Inc.* (8th Cir. 1979) 605 F.2d 380, 384, it was held that the "'attorney-client relationship raises an irrefutable presumption that confidences were disclosed.'" Disqualification of the Attorney General was upheld because of his prior representation of a litigant; whether he "did in fact receive confidential information is irrelevant, the policy considerations of the Code precluding that inquiry." (*Id.*, p. 386.) The same doctrine was enunciated in *General Motors Corporation* v. *City of New York* (2d Cir. 1974) 501 F.2d 639, 648, and *Emle Industries, Inc.* v. *Patentex, Inc.*

(2d Cir. 1973) 478 F.2d 562, 571. Also see Kramer, *Appearance of Impropriety* (1981) 65 Minn. L.Rev. 243, 255.

But, contends the Attorney General, he is not bound by the rules that control the conduct of other attorneys in the state because he is a protector of the public interest. ■ We have acknowledged "the Attorney General's dual role as representative of a state agency and guardian of the public interest." (*D'Amico* v. *Board of Medical Examiners, supra*, 11 Cal.3d at p. 15.) The Legislature has impliedly recognized that a conflict might arise because of that duality by giving the Attorney General the right to withdraw from representation of his statutory clients and to permit them to engage private counsel. (Gov. Code, § 11040.) We find nothing in that circumstance, however, to justify relaxation of the prevailing rules governing an attorney's right to assume a position adverse to his clients or former clients, particularly in litigation that arose during the period of the attorney-client relationship. ■ In short, the Attorney General cannot be compelled to represent state officers or agencies if he believes them to be acting contrary to law, and he may withdraw from his statutorily imposed duty to act as their counsel, but he may not take a position adverse to those same clients.[1]

The Attorney General insists nevertheless that he has a common law right, undefined and unrestrained, to sue in his role as "the People's legal counsel" the Governor and other public officials and agencies. This claim presupposes that the Attorney General may determine, contrary to the views of the Governor, wherein lies the public interest. ■ While there is no question that we may consider common law practices, we may do so only if they are not superseded by or in conflict with constitutional or statutory provisions. (*People* v. *New Penn Mines, Inc.* (1963) 212 Cal.App.2d 667 [28 Cal.Rptr. 337].) In this instance the Constitution—the highest indicator of the public interest—is both apposite and unambiguous.

Article V, section 1, of the California Constitution provides that "The supreme executive power of this State is vested in the Governor. The

---

[1] *Ward* v. *Superior Court* (1977) 70 Cal.App.3d 23 [138 Cal.Rptr. 532], is not to the contrary. There the lawsuit was brought by the assessor but not as a public official; he sued the county supervisors "'individually and as a taxpayer.'" (*Id.* at p. 27.) Therefore the court held the county counsel could represent the supervisors in defending the lawsuit.

Governor shall see that the law is faithfully executed." Article V, section 13, defines the powers of the Attorney General inter alia in this manner: "Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State." The constitutional pattern is crystal clear: if a conflict between the Governor and the Attorney General develops over the faithful execution of the laws of this state, the Governor retains the "supreme executive power" to determine the public interest; the Attorney General may act only "subject to the powers" of the Governor.

Consistent with the Constitution, Government Code section 12010 provides: "The Governor shall supervise the official conduct of all executive and ministerial officers." (*Spear v. Reeves* (1906) 148 Cal. 501, 504 [83 P. 432].) The Attorney General is an executive officer who "shall report to the Governor the condition of the affairs of his office" (Gov. Code, § 12522).

We recognize there are cases in other jurisdictions that permit their attorneys general to sue any state officer or agency, presumably without restriction. Such opinions arise, however, under the peculiarities of the prevailing law in those several states, and are not persuasive here. (See, e.g., *Conn. Com'n. v. Conn. Freedom of Information* (1978) 174 Conn. 308 [387 A.2d 533]); *Feeney v. Com.* (1977) 373 Mass. 359 [366 N.E.2d 1262]; *E. P. A. v. Pollution Control Bd.* (1977) 14 Ill.2d 394 [14 Ill. Dec. 245, 372 N.E.2d 50]; *Commonwealth* ex rel. *Hancock v. Paxton* (Ky.App. 1974) 516 S.W.2d 865.)

On the other hand, several jurisdictions have prevented the attorney general from acting without constitutional or statutory authority. A federal court found it incongruous for an attorney general, purporting to act for the people, to mount "an attack by the State upon the validity of an enactment of its own legislature." (*Baxley v. Rutland* (D.Ala. 1976) 409 F.Supp. 1249, 1257; see also *Hill v. Texas Water Quality Bd.* (Tex.Civ.App. 1978) 568 S.W.2d 738; *Motor Club of Iowa v. Dept. of Transp.* (Iowa 1977) 251 N.W.2d 510, 515; *People* ex rel. *Witcher v. District Court, etc.* (1976) 190 Colo. 483 [549 P.2d 778]; *Garcia v. Laughlin* (1955) 155 Tex. 261 [285 S.W.2d 191, 194]; *State v. Hagan* (1919) 44 N.D. 306 [175 N.W. 372, 374]; *State v. Huston* (1908) 21 Okla. 782 [97 P. 982, 989].)

Arizona, the constitution of which, like ours, declares that its governor "shall take care that the laws be faithfully executed" (Ariz. Const.,

art. V, § 4), reached the same conclusion as we do herein. In *Arizona State Land Department* v. *McFate* (1960) 87 Ariz. 139 [348 P.2d 912, 918], the supreme court of that state declared in an unanimous opinion, "Significantly, these powers are not vested in the Attorney General. Thus, the Governor alone, and not the Attorney General, is responsible for the supervision of the executive department and is obligated and empowered to protect the interests of the people and the State by taking care that the laws are faithfully executed."

The Arizona court further observed, with regard to a suit by the attorney general against a state agency: "Two propositions flow generally from this conception, embodied in our statutes, of the basic role of the Attorney General as 'legal advisor of the departments of the state' who shall 'render such legal services as the departments require' [citation]: the assertion by the Attorney General in a judicial proceeding of a position in conflict with a State department is inconsistent with his duty as its legal advisor; and the initiation of litigation by the Attorney General in furtherance of interests of the public generally, as distinguished from policies or practices of a particular department, is not a concomitant function of this role." (*Id.* at p. 915.)

We are not unmindful that the Attorney General may have injected himself into the litigation initiated by Pacific Legal Foundation with the public interest in mind as he perceives it. We discussed a comparable circumstance in *Anderson* v. *Eaton, supra*, 211 Cal. at page 116: "Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent."

██ Finally, we conclude that the Governor has chosen a proper remedy. It has been held that one way "in which the issue of a violation of the rule [of professional conduct] may be raised is by a motion by the former client in the case before the court to enjoin the adverse representation." (*Big Bear Mun. Water Dist.* v. *Superior Court* (1969) 269 Cal.App.2d 919, 927 [75 Cal.Rptr. 580], and cases cited.) ██ To the extent *People* v. *Johnson* (1856) 6 Cal. 499, permitted the Attorney General to sue the Governor, it is disapproved.

For the reasons stated, we enjoin the Attorney General from proceeding in this matter and order that the alternative writ be discharged and the petition be dismissed.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent, and regret today's majority opinion. It may well serve to deprive the office of the Attorney General of its traditional authority to initiate judicial proceedings which challenge the constitutional basis for procedures which are undertaken or threatened to be undertaken by public officials, including the Governor, when the Attorney General reasonably and in good faith believes such procedures to be defective. The Attorney General's traditional watch-dog function and his power to challenge questionable official conduct are important and necessary tools to assure the continued integrity of our system of government. Their loss would deprive the people of a first line of protection against improper executive conduct in appropriate cases. I trust that courts, including ours, will in the future narrowly limit the applicability of today's decision.

In the consolidated proceedings presently before us, petitioners have challenged the constitutional basis for the State Employer-Employee Relations Act (SEERA). (Gov. Code, § 3513.) In the instant cause— one of the consolidated proceedings—the Attorney General appears as petitioner on behalf of the People of the State of California. The majority does not reach in its opinion the substantive merits of the Attorney General's petition, but examines only a motion by respondent Governor to dismiss the petition on the ground the Attorney General is disqualified from filing it. Only that same limited issue is addressed in this dissenting opinion. After the relief sought by petitioners in the consolidated cases was ordered by the Court of Appeal, the Governor petitioned this court for hearing and simultaneously moved "to have the Court . . . dismiss the Attorney General's petition and to disqualify the Attorney General from any further participation in those proceedings." This issue was argued before the court in conjunction with argument on the substantive merits.

SEERA purports to provide for collective bargaining for state civil service employees as to wages, hours and other terms and conditions of state employment. However, it is also provided in California Constitution, article VII (formerly art. XXIV) that the State Personnel Board

(SPB) shall administer a civil service system of appointments and promotions, the fixing of probationary periods and classifications, the adoption of rules authorized by statute, and the review of disciplinary actions affecting employees of the state. The substantive question thus at issue but not here examined is whether the constitutional role of the SPB preempts the setting of salaries of civil service employees and, if so, whether SEERA infringes on such constitutionally vested authority. It is the Attorney General's position that the jurisdiction of the SPB to prescribe classifications for civil service positions is so integrally bound up with the setting of salaries that the legislative attempt through SEERA to subject the salary-setting function to the bargaining process conflicts with article VII.

We have said recently that, "The Attorney General ... is the chief law officer of the State (Cal. Const., art. V, § 13). As such he possesses not only extensive statutory powers but also broad powers derived from the common law relative to the protection of the public interest. [Citations omitted.] '[H]e represents the interest of the people in a matter of public concern.' [Citation omitted.] Thus, 'in the absence of any legislative restriction, [he] has the power to file any civil action or proceeding directly involving the rights and interests of the state, or which he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights and interest.' [Citation omitted.] Conversely, he has the duty to defend all cases in which the state or one of its officers is a party. (Gov. Code, § 12512.) In the course of discharging this duty he is often called upon to make legal determinations both in his capacity as a representative of the public interest and as statutory counsel for the state or one of its agencies or officers." (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 14-15 [112 Cal.Rptr. 786, 520 P.2d 10].)

In view of our foregoing description of the Attorney General's unique representative capacities which clearly distinguishes him from attorneys generally, no claim is now made by anyone that the Attorney General cannot seek a judicial declaration of the invalidity of SEERA on constitutional or other grounds. In fact, the Attorney General not only has the right but an obligation to present what he deems to be in the public interest in the face of potential conflicts with state agencies which he nominally represents. "In the exceptional case the Attorney General, *recognizing that his paramount duty to represent the public interest cannot be discharged without conflict may consent to the employment*

*of special counsel by a state agency or officer.* (See Gov. Code, § 11040.)" (*D'Amico, supra,* at p. 15, italics added.) Nor can there be any question but that the Governor is the chief executive officer of the state and that in the performance of the Governor's executive function the Attorney General is his subordinate.

However, a state Attorney General is more than a mere appendage to a Governor's office. As our description in *D'Amico* makes abundantly clear, the Attorney General is an independent constitutional officer vested with very broad powers derived from both common law and statutory origins. He is far more than a tail on the Governor's kite. It would be a serious breach on the part of an Attorney General if he or she failed to challenge a legislative enactment which he or she believed with good cause to lack constitutional basis, even though the enactment was then actively supported by a Governor. Such a challenge is not an act of insubordination proscribed by the language of article V, section 13 of the Constitution providing that as "chief law officer of the State" the Attorney General is "[s]ubject to the powers and duties of the Governor." All powers and duties, including those of the executive, are limited by the lawful exercise thereof, and the Attorney General cannot be constrained in seeking a judicial pronouncement of the lawfulness of legislation which the Governor would implement. If the Governor could impose such limitations on the Attorney General—as in this case by precluding a constitutional challenge to SEERA—then the Attorney General would not be able to test or challenge any enactment without executive approval, and the system of checks and balances envisioned by the Constitution would fail. Such a conceptual paralysis is unthinkable, of course, and the majority, fortunately, does not urge this position.

Notwithstanding the foregoing, the majority concludes that in the particular circumstances of this case the Attorney General has conducted his office in a manner which disqualifies him, thus leaving the public interest without any representation in these proceedings. The disqualifying conduct is said to deny respondents a fair opportunity to litigate issues on the merits because of advantages gained by the Attorney General through his relationships to some or all of respondents. The challenged conduct consists of (1) a letter sent by the Attorney General on September 20, 1977, to the Governor urging him to sign the legislation (Sen. Bill No. 839) enacting SEERA into law, (2) a conference between deputy attorneys general and representatives of the SPB on January 30, 1979, at which the deputies urged the invalidity of SEERA

and sought SPB support in seeking a judicial declaration thereof, and (3) utilization of those same deputies who had previously represented SPB to prosecute the instant proceedings.

The letter is of little significance. Although former Attorney General Younger urged the Governor to sign Senate Bill No. 839, it is clear that because the Governor had been active in procuring the legislation he would sign it independently of the Attorney General's recommendation. The content of the letter deals with continuing efforts by public employees to gain some participation in the determination of their working conditions and compensation, noting that "some public employees tend to believe their only effective tool to get proper attention is to strike." While the letter does not address constitutional or other legal issues, it concludes that the "bill will assist greatly in resolving [existing] grievances."

The letter may well be viewed as an effort finally to confront issues which must be resolved in the event that collective bargaining by state employees is implemented. These proceedings are a step in such resolution. The Attorney General's letter seeks to move these long-standing issues toward a final resolution without addressing the issue of constitutional infirmities, if any, in the legislation.

The Attorney General-SPB conference of January 30, 1979, was called by the Attorney General's office following commencement by Pacific Legal Foundation (PLF) of the proceedings now consolidated with the instant cause. Present at the meeting were members of SPB and its executive officers. The Attorney General was represented by Deputies Talmadge Jones and Stephen Porter. Mr. Jones noted the PLF action in which SPB was named a respondent, and stated SPB had four options in response thereto: (1) to join PLF in urging the unconstitutionality of SEERA, (2) to remain a respondent but to agree nonetheless that SEERA is unconstitutional, (3) to remain a respondent but to take a "noncommittal" position as to the constitutionality of SEERA, or (4) to defend the constitutionality of SEERA. The deputies recommended the first option. They asserted this was the unanimous view of those in the Attorney General's office who had considered the matter, and that SPB's concurrence would add weight to that view in court proceedings because of SPB's administrative expertise in concerned areas.

SPB deliberated the matter in executive session. It unanimously concluded to remain a respondent and to continue to assert the constitutionality of SEERA. When so advised, the deputies suggested the Attorney General might initiate an independent action challenging the constitutionality of SEERA. While representatives of the Attorney General's office did not meet with other respondents, within a few days of the meeting with SPB the Attorney General informed by letters to the Governor, the Controller and the SPB that in the Attorney General's view SEERA was unconstitutional and that he would commence an independent action for a judicial declaration. The Attorney General consented in the letters to the use of other counsel by the addressees. (Gov. Code, § 11040.)

There was no impropriety in the conduct of representatives of the Attorney General in meeting with SPB. The representatives did no more than inform SPB of the Attorney General's opinion concerning the constitutional invalidity of SEERA, seek the support of SPB and advise of the possibility of an independent action by the Attorney General. Indeed, the Attorney General acted well within his duties and responsibilities in asserting an opinion that SEERA was unconstitutional. His nonjudicial opinions are "accorded great respect by the courts." (*Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 752 [100 Cal.Rptr. 290, 493 P.2d 1154].) The most relevant court decision then appeared to support his conclusion. (See *Fair Political Practices Com.* v. *State Personnel Bd.* (1978) 77 Cal.App.3d 52, 56 [143 Cal.Rptr. 393].) The merits of the constitutional issue were neither stated nor discussed. The Attorney General sought no information from, and none was given by, SPB other than its status as a party in the action or actions. The Attorney General forthrightly stated his position and reasons for approaching SPB. He gained no advantage and SPB suffered no disadvantage or prejudice. This has been conceded by all parties to the action.

The final claim of misconduct is likewise wholly without significance. The fact that deputies who had earlier represented SPB are active in prosecuting the Attorney General's action against SPB and others raises no issue of a breach of confidence. The Attorney General's position on the merits in these proceedings was made clear at the outset and we are referred to neither specific advantage gained nor confidence breached. Again, this has been conceded by the parties.

In asserting disqualification the Governor relies on rules 4-101 and 5-102(B), Rules of Professional Conduct. Rule 4-101 provides: "A

member of the State Bar shall not accept employment adverse to a client or former client, without the informed and written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client." Certainly no one can claim in good faith that the Attorney General obtained confidential information by directing his September 20, 1977, letter to the Governor. In requesting and attending the January 30, 1979, conference with SPB, and in utilizing the deputies who had participated in that conference to conduct these proceedings, the Attorney General neither sought to gain nor gained, directly or indirectly, any confidential information.

The reason for the foregoing meeting becomes clear from a communication to the Court of Appeal by the Attorney General four days before the meeting with SPB. In seeking an extension of time to respond to the PLF petition, the Attorney General stated that the petition raised potential conflicts of interest among the various respondents, and that neither these conflicts nor representations by the Attorney General of the various respondents, had been resolved. The SPB meeting was essential to the Attorney General's determination of which, if any, agencies and offices he could represent. The office of the Attorney General approached SPB first as most likely to agree with PLF because SPB had only one year earlier forcefully argued its exclusive constitutional right to deal with the fixing of salaries for state employees. (See *Fair Political Practices Com.* v. *State Personnel Bd., supra,* 77 Cal. App.3d at p. 56.) The Attorney General thus had sound reason to believe SPB would join him in rejecting SEERA.

I find it significant that SPB itself raises no claim that—because of the conference or the prior representation by certain deputies—a confidence has been breached or that there is any impropriety in the Attorney General's conduct and participation in these proceedings. The Governor's reliance on cases dealing with disqualification of private attorneys pursuant to rule 4-101, is misplaced. When a public attorney is required by law to fulfill his legal duty of representing public officials or agencies in exercising exclusive control of civil litigation, the usual attorney-client relationship does not prevail within the reasonable meaning of rule 4-101. (*Ward* v. *Superior Court* (1977) 70 Cal.App.3d 23, 34 [138 Cal.Rptr. 532].) In similar fashion it has been held that county counsel was not disqualified from representing in their official capacities county officials sued by the county assessor—whom the

county counsel had previously represented—for defamation and violation of civil rights. (*Ward* v. *Superior Court, supra*, at p. 34.)

As an *alternative ground* for the holding in *Ward* that "no attorney-client relationship existed between the county counsel and [the county assessor] within the meaning of rule 4-101," the court further observed: "The purpose of rule 4-101 forbidding an attorney from accepting employment adverse to a former client is to protect the former confidential relationship. Thus the rule does not apply where an attorney accepts employment adverse to a former client if the matter bears no relationship to confidential information acquired by the attorney as a result of the former attorney-client relationship." (*Id.*, at p. 34.) Accordingly, the Governor's complete failure to establish that any confidences obtained by the Attorney General in his former attorney-client relationships bear on the merits in these proceedings is thus fatal to the motion for disqualification pursuant to rule 4-101. In fact, the issues raised on the merits of these proceedings are pure issues of law, the only question being whether a legislative enactment infringes on a constitutional proscription. There is no "confidential information" in the possession of respondents which—whether or not conveyed to the Attorney General—might have any bearing on resolution of these constitutional issues.

For reasons similar to those which render inapplicable rule 4-101 in the circumstances of these proceedings, rule 5-102(B) is also not controlling. This latter rule provides that a "member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned." The Attorney General is not, of course, representing conflicting interests in these proceedings. While it is true that he has represented or now represents clients whose interests are in conflict with those of the Attorney General as representative of the public interest, such conflicts are inherent in the applicable law pursuant to which the Attorney General must conduct himself. In his "dual role as representative of the state agency and guardian of the public interest" (*D'Amico* v. *Board of Medical Examiners, supra*, 11 Cal.3d 1, at p. 15), he may be called upon to make determinations and decisions which, while consistent with the interests of one "client," are in conflict with those of another. In such a case he must serve "his paramount duty to represent the public interest," withdraw from his other representations and consent to their employment of special counsel. (*Ibid.*) The Attorney General has conducted himself accordingly. Indeed, it is diffi-

cult to chart a course of conduct more consistent with legal requirements than that engaged in by the Attorney General whom the Governor seeks to disqualify.

The Governor's assertion that rule 5-102(B) is applicable to the Attorney General in these circumstances, if correct, would result in the disqualification of the Attorney General in every instance where he had—prior to taking action against a public official or agency guilty of some mal- or misfeasance—represented or counseled that official or agency on an independent matter. It is manifest that rule 5-102(B) is not intended to so handcuff the official who is constitutionally described as the "chief law enforcement officer of the state" and who frequently is the sole representative of the public interest. The Attorney General's role, being grounded in the common law (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d, at p. 14), is thus similar to that role fully recognized in sister states. Thus, the Supreme Court of Massachusetts has held that the Attorney General, in exercising his "'common law duty to represent the public interest'" in a manner contrary to dictates of a public agency he normally represents, is not to be "constrained by the parameters of the traditional attorney-client relationship." (*Feeney* v. *Com.* (1977) 373 Mass. 359 [366 N.E.2d 1262, 1266]; see also *Conn. Com'n* v. *Conn. Freedom of Information* (1978) 174 Conn. 308 [387 A.2d 533, 537] ["This special status of the attorney general—where the people of the state are his clients—cannot be disregarded in considering the application of the provisions of the code of professional responsibility to the conduct of his office."]; *E. P. A.* v. *Pollution Control Bd.* (1977) 69 Ill.2d 394 [14 Ill. Dec. 245, 372 N.E.2d 50]; *Commonwealth ex rel. Hancock* v. *Paxton* (Ky.App. 1974) 516 S.W.2d 865.)

The record establishes that the Attorney General has conducted himself with the professionalism required of his office, particularly in view of the usual difficulties attending a transition which occurred in that elective office in January 1979. No cause appears for his disqualification, which would thereby deprive the people of any legal representation in these important proceedings.

The Governor's motion should be denied.

Petitioner's application for a rehearing was denied April 22, 1981. Richardson, J., was of the opinion that the application should be granted.