**Lisa Hervatin ANDRIC and Lawrence Low, Plaintiffs,**

v.

**State of CALIFORNIA, Defendant.**

**No. CV 96–3634 AHM VAPx.**

United States District Court, C.D. California.

June 22, 1999.

Leo James Terrell, Beverly Hills, CA, for plaintiff Lisa Hervatin Andric.

Neville L. Johnson, Johnson & Rishwain LLP, Los Angeles, CA, for plaintiff Hon. Lawrence Low.

John M. Rea, Chief Counsel, Anthony Mischel, Asst. Chief Counsel, Frank Nelson Adkins, Counsel, Martin Fassler, Counsel, Dept. of Industrial Relations, State of California, Sacramento, CA, for defendant State of California.

## AMENDED ORDER GRANTING PLAINTIFF LOW'S MOTION TO DISQUALIFY COUNSEL FOR DEFENDANT

MATZ, District Judge.

This motion involves an ethical issue that is all-too-recurring within the legal profession: under what circumstances may a law firm hire an attorney who has previously represented a party that is litigating against the firm's client?

In this case, the professional issues are compounded by the fact that the parties themselves are attorneys. The plaintiffs are lawyers who served as Workers' Compensation Judges for the California Department of Industrial Relations ("DIR"). The claims and issues all arise out of their employment in that capacity. In their initial complaint plaintiffs sued at least one other administrative judge, an in-house lawyer, and their employer, the DIR, which administers the California workers' compensation system.[1] The lawyers who

---

1. Technically, the defendant is the State of California. At the hearing on this motion, counsel for defendant acknowledged that in all practical and analytical respects the real defendant is the DIR. Evidently realizing the implications of that admission, he thereafter filed a "correction" asserting that "The Division of Workers' Compensation is or should be the actual defendant." He went on to note, however, that the Division of Workers' Compensation is an "entity within the DIR," albeit supposedly "autonomous," and the de-

have been representing the defendants also work for the DIR. They are, in effect, in-house counsel for the very agency that employed plaintiffs. Now, on the proverbial eve of trial, plaintiff Low seeks to disqualify DIR's counsel because of an actual or potential conflict of interest.

Despite the parties' professional backgrounds—perhaps because of their backgrounds—the lawsuit has been fought with white hot intensity. In the exhibits submitted to the Court, some of the lawyers appear unable to express their positions without resort to invective.[2] But their hyperbole cannot disguise that an important ethical concern is at stake. For the reasons set forth below, the Court reluctantly concludes that counsel for the defendant must be recused.

### FACTS

#### I. *Procedural History of the Case*

Former plaintiff Ernest Patrick Kiernan[3] served as a Workers' Compensation Judge from April 18, 1988, until his termination on November 1, 1994. Plaintiff Lawrence Low ("Low") served as a Workers' Compensation Judge from May of 1991 until his termination on June 13, 1996. Plaintiff Lisa Hervatin Andric ("Hervatin") served as a Workers' Compensation Judge from June 21, 1991, until her termination on February 20, 1998.

Plaintiffs Low and Hervatin allege that, during the course of their employment, Presiding Chief Judge Rebeck (formerly a defendant) humiliated and harassed Judge Kiernan about his physical condition and mental capacity after he suffered a stroke. On March 24, 1994, Judge Rebeck called a meeting of the judges, in which he discussed what Low and Hervatin construed to be confidential medical information pertaining to Kiernan. Plaintiffs Low and Hervatin complained that Rebeck's comments violated Kiernan's privacy rights. Plaintiffs allege that Judge Rebeck and other judges and administrators in the DIR later retaliated against them by placing corrective memoranda in their files, subjecting them to discipline for baseless allegations of misconduct, and ultimately terminating them from their employment.[4]

In August and September, 1995, before they filed this action, Low and Hervatin hired the law firm of Tuttle & Taylor to represent them in this matter. Attorney Ralph Semien, then an associate at Tuttle and Taylor, worked on plaintiffs' case. Semien participated in interviews with the plaintiffs, gave them confidential advice regarding their case, and was privy to all their "confidential feelings, records, theories, private documentation, memoranda" and other communications relating to this action. Low Dec. ¶ 2; Hervatin Dec. ¶ 2. Semien drafted an internal memo to a partner at Tuttle & Taylor, outlining relevant strategies, as well as strengths and weaknesses of plaintiffs' case. *Id.* Semien also drafted the "key demand letter" which the partner sent to defendant prior to the filing of the complaint. *Id.* Semien left Tuttle & Taylor shortly afterward. Semien Dec. ¶ 5. It is not clear whether that firm did any further work on the case. However, Low asserts that Semien contin-

---

fendant's lawyers have conceded that they provide "legal representation" to the Division of Workers' Compensation. That being the case, and because of the other factors discussed in this Order, it is indisputable that the real party-in-interest is the DIR.

2. Lawyers who become seized with the fervor of battle would be well-advised to recall what Benjamin Franklin once stated: "In my Travels I once saw a Sign call'd *The Two Men at Law;* One of them was painted on one Side, in a melancholy Posture, all in Rags, with this

Scroll, *I have lost my Cause.* The other was drawn capering for Joy, on the other Side, with these Words, *I have gain'd my Suit;* but he was stark naked." *Poor Richard's Almanack,* 1742, in *Papers of Benjamin Franklin,* 2:339 (Leonard W. Labaree ed.1960)

3. Judge Kiernan has settled and is no longer a plaintiff in this action.

4. Both plaintiffs were fired during the course of this lawsuit.

ued to give Hervatin and him "legal advice on this case after he left Tuttle & Taylor." *Id.* ¶ 2.[5]

Plaintiffs filed the original complaint in this matter on May 21, 1996. Their attorneys of record were not Tuttle & Taylor or Semien. Plaintiffs sued the State of California and certain individual defendants.[6] They alleged causes of action for employment discrimination and retaliation in violation of the Americans with Disabilities Act, the California Fair Employment and Housing Act ("CFEHA") and various other California common law and statutory claims. Plaintiffs subsequently amended the complaint a total of four times. The Fourth (and last) Amended Complaint was filed on February 17, 1998.

By order dated June 30, 1998, the Honorable John G. Davies, the judge previously assigned to this case, granted summary judgment dismissing all causes of action alleged against the individual defendants and the ADA claim against the State. Following his order, the sole remaining claim in this case has been that, in violation of CFEHA, defendant, by and through its agents and employees, retaliated against plaintiffs because they engaged in protected speech.

## II. *Counsel for Defendants*

■ All the lawyers who have represented defendant belong to what is called the "Office of Director, Legal Unit" of the DIR ("Legal Unit"). Although the briefs on this motion do not explain how the DIR Legal Unit operates, it appears that it is a cadre of lawyers who are the equivalent of in-house counsel for a private corporation. They have a statewide practice with offices located in Los Angeles, Sacramento and San Francisco. At the hearing, their lead counsel stated that the Legal Unit represents all of the DIR's many constituent divisions and agencies on all personnel matters (including litigation) and certain other facets of civil litigation. He said that the Legal Unit has close to 30 attorneys, 10–12 of whom are in Los Angeles. They function, he represented, on a decentralized basis, without statewide coordination. However, the record in this case shows that the Legal Unit lawyers are in frequent communication; they coordinate their hiring decisions; and in this case they designated attorneys from all three offices as counsel. Of the two lawyers who have been primarily responsible, one is in the San Francisco office and the other in Sacramento.

The ABA Model Rules of Professional Conduct recognize that, "With respect to the law department of an organization, there is ordinarily no question that the members of the department constitute a firm within the meaning of the Rules of Professional Conduct." Comment [2] to Rule 1.10. For all purposes, therefore, the Legal Unit must be considered as a single law firm, just as multistate firms with branch offices are, and are considered, a single firm.

## III. *Defendants and Their Counsel Hire Semien*

In March, 1998, there was an opening for an attorney in the Los Angeles office of the Legal Unit. Anthony Mischel, Assistant Chief Counsel for the DIR in charge of the Los Angeles Office, interviewed Semien for the position. Mischel Dec. ¶ 2.[7]

---

**5.** Nothing in this opinion or in the record suggests any impropriety whatsoever in the conduct of Tuttle & Taylor.

**6.** The individual defendants were Judge Rebeck; Vanessa Holton, then staff counsel at DIR; Mark Kahn, a lawyer and former Workers Compensation judge and then Assistant Chief of the Southern California Region; Casey Young, then Administrative Director for Workers Compensation, of the DIR; William

Whiteley, then a Workers Compensation regional manager at DIR; and Lloyd Aubry, then overall Director of DIR.

**7.** Mischel's name appears on the pleadings in this action. He asserts that he has never done any work on this case and that his name is on the pleadings only because, if the Northern California offices of the DIR could not complete papers in time to have them filed with an original signature, the papers could

During the course of the interview Semien revealed to Mischel that he had done some work on plaintiffs' case against DIR, but indicated that he "had no involvement in writing the complaint." *Id.* ¶ 3. At that point Mischel and Semien "agreed we would not talk about the case," and Mischel "did not inquire into how much involvement Mr. Semien had" in the case, for fear that Semien might disclose confidential information. *Id.*[8]

Vanessa Holton, who at the time of Semien's interview was still a named defendant in this action, is the Assistant Chief Counsel for the Legal Unit. She works in San Francisco. Mischel asserts that, "[b]ecause of the tone of the department's [previous] interactions with [the Tuttle & Taylor partner who had supervised Semien] both Ms. Holton and I had some concerns about whether Mr. Semien would be able to maintain the proper professional demeanor in his representation of the Department." *Id.* ¶ 5. Mischel and Holton met with Semien in April, 1998 to discuss their concern. Mischel states that "the facts in this case were not discussed" at that meeting. *Id.* at 5.

Following these interviews, Mischel contacted Frank Nelson Adkins, the defendant's lead trial counsel on this case, to discuss the Legal Unit's potential conflict if it were to offer Semien a position. Mr. Adkins has had overall responsibility for the defense of the DIR throughout this

case. Adkins Dec. ¶ 2. During this conversation Adkins informed Mischel that Semien was named on plaintiffs' witness list. Not surprisingly, Adkins "was insistent that an impermeable 'fire wall' be erected immediately" to ensure that Semien would not be involved in the case and would not discuss it with those who were. *Id.* ¶ 6. Afterward, Mischel told Semien that plaintiff had designated him as a witness. Semien said he was unaware of that fact. *Id.* In any event, for unrelated reasons he withdrew his application for the position with DIR. *Id.*

In November, 1998, however, Semien contacted Mischel again, expressing renewed interest in joining the Legal Unit. In December, 1998, Mischel offered him a job in the Los Angeles office, with the mutual understanding that Semien would not discuss plaintiffs' case with Mischel or anyone else in DIR. *Id.* ¶ 7. Mischel instructed "everyone in the Los Angeles office who handle personnel work that there was to be no discussion of the Hervatin case around Mr. Semien." *Id.* There are no case files in the Los Angeles office and Mr. Semien has not been assigned to legal work involving personnel issues. *Id.,* ¶ 9.

There is no indication that DIR gave any further consideration to the propriety or manner of hiring Semien, despite the facts that he had served as counsel for plaintiffs and had been named as a witness. For example, DIR did not condition

---

be sent to him by facsimile and he could sign them instead. *Id.* ¶ 9, 172 Cal.Rptr. 478, 624 P.2d 1206. Mischel further asserts that no one in the Los Angeles office of the Legal Unit has ever done any work on this case, nor are any case files kept in the Los Angeles office. *Id.* ¶ 9, 172 Cal.Rptr. 478, 624 P.2d 1206. Plaintiff Low hotly contests defendant's representation that the Los Angeles office has not been involved in this case. Specifically, Low avers that Mischel appeared at counsel table both at the summary judgment hearing before Judge Davies on June 8, 1999, and at Low's hearing before the Personnel Board, which dealt with the contentions and triggered some of the claims which are the subject of this action. Low Dec. ¶ 3. At the hearing on this motion, counsel for the DIR asserted that Mischel was

present at both proceedings, but did not sit at counsel's table or represent the DIR.

8. In opposing this motion, defendant inexplicably attaches great importance to the fact that Semien did not draft the complaint. So what? It is undisputed that he drafted the demand letter. Surely defendant's counsel is aware that the factual and legal research, client counseling and strategy formation that precede the drafting of an initial demand letter to an adversary all deal with the very heart of a client's case. Such is the case here. Semien's draft (Exh. 14 to the motion) addressed the sole remaining claim (for retaliation) in great detail, and advocated plaintiffs' positions on their other claims as well.

Semien's employment upon his disclosing the offer to his former clients or upon his obtaining their written consent.

Semien did not in fact inform plaintiffs of his new position with DIR, much less obtain their written consent. Nor did he inform them that he had learned that they had named him as a trial witness. Plaintiffs learned that Semien was working for DIR on March 5, 1999, when Hervatin attempted to contact him concerning her desire to call him as a witness at trial. Hervatin Dec. ¶ 4. Low filed this motion shortly thereafter.

Low and Hervatin strenuously object to Semien's employment with the Legal Unit. Low Dec. ¶ 3; Hervatin Dec. ¶ 4. They assert that his employment is "devastating" to them, given his substantial involvement with their case and possession of confidential information. *Id.* Moreover, Hervatin and Low intend to elicit testimony from him, which they separately described in an *in camera* filing. The Court finds that all but one of the proffered subjects of Semien's testimony are contrived, but there is at least one topic about which he could reasonably be expected to testify.

Mr. Adkins and his co-trial counsel Martin Fassler, who themselves are DIR employees but do not work in the Los Angeles office, state that they alone have handled this case, and that neither has had any substantive contact with Semien. Adkins Dec. ¶ 3 (Adkins avers that he has never even met or spoken with Semien); Fassler Dec. ¶ 5. Semien confirms that this is the case. *See* Semien Dec. ¶¶ 7–9.

But there is more to the conflict than the roles of Messrs. Adkins and Fassler. Low contends that Vanessa Holton sat in on both his and Hervatin's depositions, where she took notes on her computer and passed questions to Adkins. *Id.* ¶ 4. She will be a key witness (although no longer is a defendant). John M. Rea, Chief Counsel for the Director and head of the Legal Unit, also appears on the caption for defense counsel. Low contends that Semien

works under the supervision of both Holton and Rea, a contention that Defendant denies. Low argues that, as a result, Semien "will be a percipient witness testifying against his current superiors," and that by virtue of that conflict is now a hostile witness. Defendant strenuously argues that Rea will not be a witness and that Holton is not Semien's superior. What Defendant overlooks, however, is that to the extent that Semien gives testimony helpful to the Plaintiffs, he inherently will be at odds with the efforts and advocacy of his employer and its principal lawyers who are, overall, his colleagues.

After plaintiffs became aware of Semien's new employment, Low's counsel attempted to get Semien to disclose the nature of his new employment and what, if any, communications he had passed to the Legal Unit or to the DIR in general. Semien obtained an attorney who is not employed by the DIR. That lawyer ultimately took the position that a declaration Semien executed and that defendants submitted in opposition to this motion sufficiently responded to all of Low's inquiries and that Semien would not respond further. Semien's counsel also expressed his doubt that there was any appropriate matter on which Semien could testify at trial, and indicated that Semien now is "reluctant to involve himself further in this dispute."

Based on these facts, plaintiff Low argues that the Legal Unit in its entirety must be disqualified as counsel for defendant. Plaintiff Hervatin does not support or oppose the motion. *See* Terrell Dec. ¶ 3.

### DISCUSSION

■ There is no dispute that Semien owes duties of loyalty and confidentiality to his former clients, the plaintiffs. Nor is there any dispute that as a result of these duties he has a conflict of interest. Also acknowledged by both sides is the fact that the DIR took several measures to screen

Semien from this case. The fundamental issue is whether those efforts are sufficient to enable DIR's in-house counsel, the Legal Unit, to continue to represent defendant. Put another way, must the full firm be disqualified?

As the following analysis demonstrates, no federal case dealing with California attorneys has applied the current California or ABA rules to require full firm disqualification of a government legal department that erected an "ethical wall" to screen the lawyer who had the conflict. There are, however, California cases that imposed just that sanction as a remedy for the conflict. Moreover, none of the cases relied on by defendant involved the two unusual factors present here: (1) the lawyer who has the conflict has gone to work for not only the adversary's law firm, but for the adversary itself, and (2) that lawyer may be a witness at trial. Primarily because of these factors, the Court concludes that current counsel must be disqualified.

## I. Standards for Disqualification of Counsel

■ The district court has primary responsibility for overseeing the conduct of the attorneys who appear before it. *Trone v. Smith,* 621 F.2d 994, 999 (9th Cir.1980). There are a number of applicable rules and principles.

### A. The Rules and California Statute

1. *Central District Rules.* Chapter 7 of the Central District of California's Local Rules, Attorney Disciplinary Rules of the Court (hereinafter "ADR"), provides:

1.2 Standards of Professional Conduct—Basis for Disciplinary Action

In order to maintain the effective administration of justice and the integrity of the court, each attorney shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the deci-

sions of any court applicable thereto. These statutes, rules and decisions are hereby adopted as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline. The Model Code of Professional Responsibility of the American Bar Association may be considered as guidance.

2. *California Business & Professions Code and Rules of Professional Conduct.*

California Business and Professions Code section 6068(e) requires an attorney to "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Cal. Bus. & Prof. C. § 6068(e).

The California State Bar Rules of Professional Conduct ("Cal.RPC") provide in relevant part that:

A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Cal. RPC Rule 3–310(E).

In the Cal. RPC, there are no rules or comments explicitly addressing the question present here—whether an individual's conflict under Rule 3–310(E) requires disqualification of his or her entire firm.

3. *ABA Model Rules.* The ABA Model Code referred to in Central District ADR Rule 1.2 has been superseded and replaced by the ABA Model Rules of Professional Conduct ("MRPC"). The MRPC contains many lofty pronouncements about an attorney's duties of loyalty and confidentiality. Thus, Comment [1] to Rule 1.7 ("Conflict of Interest: General Rule") provides that "Loyalty is an essential element in the lawyer's relationship to a client." Comment [3] to that rule states, "As a general proposition, loyalty to a client prohibits undertaking representation directly ad-

verse to that client without that client's consent." MRPC 1.9(c) provides:

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except . . . when the information has become generally known; or

(2) reveal information relating to the representation . . . .

Comment:

[10] The second aspect of loyalty to a client is the lawyer's obligation to decline subsequent representations involving positions adverse to a former client arising in substantially related matters. This obligation requires abstention from adverse representation by the individual lawyer involved, but does not properly entail abstention of other lawyers through imputed disqualification. . . . Thus, if a lawyer left one firm for another, the new affiliation would not preclude the firms involved from continuing to represent clients with adverse interests in the same or related matters, so long as [concerns regarding] confidentiality have been met.

MRPC Rule 1.9 and Comment 10.

With respect to government attorneys, MRPC 1.11 provides:

(c) Except as law may otherwise expressly permit, a lawyer serving as a public officer or employee shall not:

(1) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless under applicable law no one is, or by lawful delegation may be, authorized to act in the lawyer's stead in the matter . . . .

Comment:

[9] Paragraph (c) does not disqualify other lawyers in the agency with which the lawyer in question has become associated.[9]

MRPC 1.11 and Comment 9.

In addition to the foregoing Comment 9, the ABA rules elsewhere recognize practical and policy considerations that militate against full firm disqualification. For example, Comment [3] ("Lawyers Moving Between Firms") to Rule 1.9 ("Conflict of Interest: Former Client") notes that

there are several competing considerations. First, the client previously represented by the former firm must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. In this connection, it should be recognized that today many lawyers practice in firms, that many lawyers to some degree limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

Comment [10] ("Adverse Positions") to the same ABA Rule 1.9 states in part: The second aspect of loyalty to a client is the lawyer's obligation to decline subsequent representations involving positions adverse to a former client arising in substantially related matters. This obligation requires abstention from adverse representation by the individual lawyer involved, but does not properly entail abstention of other lawyers through imputed disqualification.

9. Defendant places great reliance on this comment.

And Comment [3] to Rule 1.11 provides that:

> However, the rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government. The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards. The provisions for screening and waiver are necessary to prevent the disqualification rule from imposing too severe a deterrent against entering public service.

To summarize, none of the California or ABA rules cited in Central District ADR Local Rule 1.2 explicitly compels the outcome urged by plaintiff—namely, the complete disqualification of the Legal Unit of DIR. However, the facts of this case and the holdings and principles in other relevant federal and state decisions do require just that.

## II. DIR Cannot Continue to Represent Defendant in this Action.

### A. Ninth Circuit and California Federal District Court Cases

In *Trone v. Smith,* 621 F.2d 994, the Court of Appeals disqualified an entire law firm from prosecuting a breach of fiduciary duty claim on behalf of a corporate debtor's bankruptcy trustee against an individual whom the firm had represented years previously. The firm asserted (unlike Semien here) that it had not acquired confidential information in the course of the prior representation. The Court of Appeals rejected that contention and also deemed "plainly wrong" the trial court's finding that "there was no close relationship between the [two] matters . . . ." Citing several compelling professional and ethical factors, the court noted that "institutional standards of the legal profession impose upon the attorneys a continuing obligation not to change sides after the

representation has ceased. This obligation is what distinguishes a professional relationship from one involving merely a barter and sale." *Id.* at 1000. Moreover, the court noted, "Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases. From this standpoint it matters not whether confidences were in fact imparted to the lawyer by the client. The substantial relationship between the two representations is itself sufficient to disqualify."

The language and holding of *Trone v. Smith* would support full firm disqualification except for one key distinction: in *Trone,* the court did "not reach, and therefore expresses no opinion upon, the 'Chinese Wall' theory under which disqualification motions have been resisted without success by large law firms whose branch offices may have 'sealed off' apparent conflicts between offices." *Id.* at 999, n. 4 *(citing cases).*

In *Paul Iacono Structural Engineer, Inc. v. Humphrey,* 722 F.2d 435, 440 (9th Cir.1983), the Ninth Circuit affirmed the district court's order disqualifying defendants' counsel, the Van Bourg law firm, after it hired an associate who had previously investigated plaintiffs' claims against defendants when he worked for the National Labor Relations Board. In reaching its decision, the court in *Humphrey* relied extensively on then-existing ABA Model Code Disciplinary Rule 5–105(D), which mandated that, "if a lawyer is required to decline employment . . . no [ ] other lawyer associated with him or his firm may accept or continue such employment." *Id.* at 442 *(quoting* Model Code Disciplinary Rule 5–105(D)). Defendants in that case urged the court to adopt an exception to this "vicarious disqualification" rule if the tainted attorney had been "screened" from financial interest and participation in the case. *Id.*[10] However, after noting that in

---

**10.** The "ethical wall" includes "exclusion from participation in the action, absence of

access to relevant files, and a rule against discussion of the case in the presence of the"

*Trone* the court had left open the question of whether firm-wide disqualification would be necessary if screening procedures had been used, the Ninth Circuit declined again to answer that question "because the record in this case does not show that any such screening procedure was in place at the Van Bourg firm." *Id.*

Disciplinary Rule 5–105(D) has been superseded by MRPC Rule 1.10, which explicitly *excludes* from its scope former private attorneys who switch to working for a government agency. MRPC Rule 1.10 and Comment 4. As shown above, their conduct is governed by Rule 1.11(c)(1) and Comment 9 to that Rule states that the Rule "does not disqualify other lawyers in the [government] agency with which the lawyer in question has become associated." MRPC 1.11 at Comment 9. Thus, while *Humphrey* remains good law in this circuit, to the extent it relies on an abandoned ABA disciplinary rule, it does not definitively address the question (central to this case) of "full firm disqualification" of a government legal agency that has erected an ethical wall.

Defendant places great reliance on *In the Matter of the Grand Jury Investigation of Targets*, 918 F.Supp. 1374 (S.D.Cal. 1996) ("*Targets*.") In *Targets*, the targets of a grand jury investigation moved to disqualify the U.S. Attorney's Office in San Diego from investigating them, on the basis that a recently-hired AUSA had represented one of them in a state investigation of the same alleged misconduct. *Id.* at 1375. Initially, the federal investigation

had been kept strictly confidential within the U.S. Attorney's Office. Only the top leadership of the office and two other assistants knew about it, and the files were kept in a different facility, where all the work was performed. Those working on the case did not know about the tainted AUSA's prior representation and he, in turn, did not know about the investigation. After the connection came to light, he was completely screened from the case. Id. at 1378.

The district court first concluded that the "assumption of free flow of information within private law firms did not hold for large government agencies." *Id.* (*citing* ABA Model Rule 1.11(c)(1) and comment, *supra*, and *United States v. Weiner*, 578 F.2d 757, 767 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978)).[11]

Also of importance to the district court was the view that the "only choices for federal prosecution are the local Assistant U.S. Attorneys, Department of Justice attorneys, or special prosecutors." *Targets*, 918 F.Supp. at 1378, n. 11. *Citing Weiner and United States v. Mapelli*, 971 F.2d 284 (9th Cir.1992), the district court found that the Ninth Circuit had not "intended imputed disqualification to apply to government attorneys . . . ." *Id.* at 1378. Because the U.S. Attorney's Office in question had in excess of 75 attorneys, and because there was evidence that the tainted attorney had been effectively screened from the case,

---

tainted lawyer. *Humphrey, supra* at 442 n. 10, citing case.

**11.** In *Weiner*, the defendant in a criminal prosecution sought to disqualify the entire U.S. Attorney's Office because an attorney for the federal investigating agency (the Securities & Exchange Commission) had once worked in private practice for the defendant's law firm. The S.E.C. was alleged to have had "close cooperation" with the prosecutors. In upholding the district court's denial of the disqualification motion, the Ninth Circuit found that while it "may be possible" to impute the law firm's knowledge to the attorney,

it would be "tenuous" to attribute his knowledge to the prosecutors. "A free flow of information may be assumed to exist within a law partnership, but the size and diversity of many government agencies make similar assumptions about agencies wholly unrealistic." *Id.* at 767. *Weiner* has no bearing on this case, because Semien works for the DIR; his relationship with the adversary of his former clients is direct and immediate, whereas in *Weiner* the link was "tenuous." Furthermore, in *Weiner*, unlike this case, there was no evidence that the attorney actually possessed confidential information.

the court refused to disqualify the entire office. *Id.* at 1380.

This Court declines to adopt the result in *Targets*, for several reasons. First, it is not correct that the Ninth Circuit has established a rigid rule that imputed disqualification "does not apply to government attorneys." As to *Weiner*, see footnote 11. As to *United States v. Mapelli, supra*, the individual AUSA was subject to disqualification only because he had heard the defendant's immunized grand jury testimony. *Id.* at 287–88. Where that is the claimed basis for the disqualification of a lawyer, it is typically unnecessary to disqualify the rest of the prosecuting office, because in federal criminal practice the very concept of an AUSA obtaining immunized testimony from a suspect is based on the understanding that if the case proceeds to trial other AUSA's, who had no access to the immunized testimony, will try it. In short, it is contemplated that ethical walls will be erected. Unlike that scenario, when speaking to Semien, plaintiffs had no basis to suspect that he would go to work for the very entity they expected to sue and for the very Legal Unit that would represent it.

Next, the *Targets* court declined to consider California cases involving disqualification of private attorneys, because "California law recognizes that different disqualification rules apply to prosecutors than to private attorneys." *Targets, supra*, at 1379 n. 1. While that is an ambiguous observation—see below—it is inapplicable here. Although a government agency, DIR is not a prosecuting office. A prosecutor's office is deemed to be—or at least required to be—more balanced in its advocacy than other governmental lawyers. In *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the Supreme Court noted,

[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

Here, in contrast to the typical function of a prosecutor, the DIR is the very party to the dispute and its Legal Unit has displayed great zeal in carrying out its duty of advocacy. There is no doubt that it is out to win this case, which has involved incendiary accusations (*i.e.*, corruption) against the DIR.[12]

Finally, another major factual distinction that renders *Targets* unpersuasive here is that the U.S. Attorneys Office had 75 lawyers, and it was undisputed that almost none of them had any connection to the investigation. Here, in contrast, the Legal Unit's entire, statewide legal staff has only 30 attorneys. Low contends that this is the "hottest, most talked about case in the office." *Id.* Who can doubt it? Two fired Workers Compensation judges claim there is office-wide corruption and take on the Presiding Judge. Any Legal Unit lawyer who didn't follow the course of the ensuing donnybrook surely would be a candidate for the see-no-evil, hear-no-evil, speak-no-evil annual award. Thus, while under the facts in *Targets* the result is sensible and sound, it would be naive and unrealistic to apply that court's view about large government agencies here.

In *Asyst Technologies, Inc. v. Empak, Inc.*, 962 F.Supp. 1241 (N.D.Ca.1997), the court applied MRPC 3–310(E) to disqualify an entire large law firm from defending a client against a patent infringement claim, where two of its partners had represented the plaintiff in prosecuting those patents 14 years previously. The law firm vigor-

---

**12.** Nevertheless, this Court has no basis to find, and does not find, that in going along with the hiring of Semien the individual attorneys who have handled this case thus far attempted anything devious or insidious. Nor does the Court find that Semien set out to subvert his former clients' interests or betray their confidential communications, although his failure to obtain their consent is inexcusable.

ously contended that those lawyers' knowledge should not be imputed to the firm, because they had acquired the knowledge while they were at a different firm; they had not discussed the case with other lawyers at the firm opposing disqualification; and that firm had circulated a memorandum instructing its other lawyers not to discuss the matter with them. In rejecting the latter arguments, the district court observed "assuming the Ninth Circuit were to recognize the use of ethical screens, I question whether the simple circulation of a memorandum as was done here could be an effective screen." *Id.*, at 1243, n. 5.

In *Elan Transdermal Limited v. Cygnus Therapeutic Systems*, 809 F.Supp. 1383 (N.D.Cal.1992), a large law firm undertook to sue a former client for patent infringement. Attorneys previously with the firm had helped the defendant apply for the patent. They left the firm before the lawsuit was filed, however. The district court held that the presumption of shared confidences in a law firm is "conclusive" under California law and consequently disqualified the entire law firm.[13]

## B. California Cases

Several California cases have dealt with the disqualification of an entire law firm as a result of the conflict presented by one of its lawyers. In *Dill v. Superior Court*, 158 Cal.App.3d 301, 306, 205 Cal.Rptr. 671 (1984), the court took note of

the right of parties to counsel of their choice, and of the financial burden imposed if disqualified counsel must be replaced. [Citation.] However, those

interests must be balanced against the need to maintain high ethical standards of professional responsibility. [Citation.] Here, the compelling reason for disqualification from representation is Hale's former personal involvement on petitioner's behalf in the identical action. Under these circumstances, the law firm representing real parties also must be disqualified.

*Dill v. Superior Court*, 158 Cal.App.3d 301, 306, 205 Cal.Rptr. 671 (1984) (*citing Trone v. Smith, supra*, 621 F.2d at 999).[14] Under the rule in *Dill*, the "ethical wall" screening procedure is "not applicable when the attorney in question performed work for the opposing party in the same lawsuit." *Klein v. Superior Court*, 198 Cal.App.3d 894, 912, 244 Cal.Rptr. 226 (1988). (*citing Dill*) (disqualifying firm for conflict of one of its partners where no attempt was made to erect ethical wall).

Other California courts also have applied the rule in *Dill*. In *Henriksen v. Great American Savings and Loan*, 11 Cal. App.4th 109, 14 Cal.Rptr.2d 184 (1992), as in this case, the tainted attorney had worked on the very litigation on which he had switched sides. The court reaffirmed the conclusion reached in *Dill*:

the ethical wall concept has not found judicial acceptance in California on our facts: a nongovernmental attorney armed with confidential information who switches sides during the pendency of litigation. Certainly the *Dill* court did not endorse the concept. Instead it concluded: "the law firm representing real parties must also be disqualified." [Ci-

---

13. In doing so, the court stated that the view expressed in *United States v. Titan Pacific Construction Corp.*, 637 F.Supp. 1556, 1564 (W.D.Wash.1986) that the presumption of shared information is rebuttable is "not ... the law of the Ninth Circuit or California, especially in light of *Paul E. Iacono*". *Id.* at 1392. Defendant relied on *Titan Pacific* in opposing this motion.

14. Here, defendant thus far has incurred no out-of-pocket attorneys' fees, given that the

Legal Unit is state-funded anyway. Another concern that sometimes is presented by disqualification motions also is inapplicable here: that the moving party is motivated by a desire to obtain a strategic advantage. Here, defendant has not even suggested that plaintiffs are proceeding for that reason, and indeed plaintiffs' desire for an expeditious trial date is frustrated by this motion. (See below.)

tation.] In the *Dill* court's view there simply was no gray area; nor do we see any: the entire firm must be vicariously disqualified even if [the tainted attorney] has been ethically screened from day one.

11 Cal.App.4th at 115–16, 14 Cal.Rptr.2d 184. Counsel in *Henriksen* argued (as does defendant here) that the language about "balancing" in *Klein, supra,* suggests that vicarious full firm disqualification no longer is a rigid requirement in California. However, the *Henriksen* court rejected that argument, finding that *Klein* was "factually inapposite in that the former representation reviewed there was not in the identical lawsuit" as it was in *Henriksen*—and as it is in this case. *Henriksen,* 11 Cal.App.4th at 116, 14 Cal.Rptr.2d 184.[15]

Like *Klein,* the other cases on which defendant relies in arguing that disqualification of the Legal Unit is not mandated are readily distinguishable on their facts. *In re Marriage of Zimmerman,* 16 Cal. App.4th 556, 20 Cal.Rptr.2d 132 (1993) (disqualification denied where plaintiff's prior relationship with another attorney at same firm as defendant's attorney was limited to a single conversation about the case, and plaintiff failed to show that she had imparted any confidential communication to him); *Mills Land & Water Co. v. Golden West Refining Co.,* 186 Cal.App.3d 116, 230 Cal.Rptr. 461 (1986) (where no issue of confidential communications was involved, disqualification of opposing counsel who directly contacted corporate director in violation of professional conduct rules was limited only to the individual attorney); *Chambers v. Superior Court,* 121 Cal.App.3d 893, 904, 175 Cal.Rptr. 575 (1981) (vicarious disqualification of law firm was abuse of discretion where there was no evidence that associate, while a state employee, had any responsibility over matters related to the instant action or had acquired confidential information regarding the action, and where firm had taken sufficient protective measures to screen attorney from participation in the action); *Chronometrics, Inc. v. Sysgen, Inc.,* 110 Cal.App.3d 597, 168 Cal.Rptr. 196 (1980) (disqualification of entire firm because of cross-complainant's attorney's inappropriate *ex parte* communication with cross-defendant was abuse of discretion, and disqualification only of individual attorney was appropriate, because no confidential communications were implicated).

Defendant also relies on *Love v. Superior Court,* 111 Cal.App.3d 367, 168 Cal. Rptr. 577 (1980) (disqualifying only the major crimes section of the district attorney's office due to the conflict of one of its attorneys, but allowing another division of the same office to conduct the prosecution). In *Love,* the court based its ruling on the need to permit the district attorney, as the "People's duly elected public prosecutor," to execute his responsibility for the underlying prosecution, and on the fact that there were 95 attorneys in the office, only five of whom worked in the major crimes division which was then prosecuting the case. 111 Cal.App.3d at 374–75.[16]

---

**15.** The California Supreme Court cited *Henriksen* approvingly (although in dictum) in *Flatt v. Superior Court,* 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 541, 885 P.2d 950 (1994).

**16.** Despite these serious considerations, other courts have recused an entire prosecutive office where there has been particularly egregious conduct. *See, e.g., Younger v. Superior Court,* 77 Cal.App.3d 892, 144 Cal.Rptr. 34 (1978) (recusing entire District Attorney's Office of Los Angeles County from prosecution of felony cases handled by the former law firm of the newly appointed, third ranking lawyer in the office, because that attorney attended weekly executive staff meetings and supervised the promotion process; court noted that the appearance of impropriety, as well as any actual conflict, must be avoided). *Younger* has since been superseded by Cal. Penal C. § 1424, which requires that the "motion [to recuse the district attorney] shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." *People v. Conner,* 34 Cal.3d 141, 147, 193 Cal.Rptr. 148, 666 P.2d 5 (1983) *(quoting* Cal. Penal C. § 1424).

*Love* is distinguishable for some of the same reasons as *Targets:* the court could safely conclude that the disqualification of only part of the prosecutor's office would fully dispel the concerns of confidentiality and impropriety. In the much smaller Legal Unit of the DIR, which has so much at stake in this litigation, that conclusion is just not realistic.

## CONCLUSION

There is something more than an attorney switching sides here—and that "something" presents too great a concern to be dispelled by an ethical wall. For Semien not only is working for defendant's counsel, but for defendant itself. Some of his supervisors are among the alleged perpetrators of the very wrongs for which plaintiffs seek redress in this action. Some will be witnesses, such as Holton and other lawyers who plaintiffs named as defendants. As if this unprecedented circumstance were not enough, there is another twist: plaintiffs were planning to elicit testimony from Semien himself. *C.f. People v. Conner, supra,* 34 Cal.3d 141, 193 Cal. Rptr. 148, 666 P.2d 5 (1983) (affirming recusal of entire district attorney's office where deputy district attorney working in the office was both a witness to and victim of the criminal conduct for which defendant was being prosecuted). In short, Semien's employment with the Legal Unit of DIR cannot be brushed aside. Even if the Court could accept defendant's assurances that Semien has not divulged and will not divulge the confidential information he indisputably possesses, it would still be inappropriate and unfair to subject plaintiffs to the not-fanciful concern that their interests have already been compromised ... or could be, in the days ahead.

All attorneys owe a "duty of loyalty" to their clients and former clients. As the California Supreme Court has stated,

> an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not

do anything which will injuriously affect his former client in any manner in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.

*People ex rel. Deukmejian v. Brown,* 29 Cal.3d 150, 155, 172 Cal.Rptr. 478, 624 P.2d 1206 (1981) (*citation deleted*). This duty is part of what makes the practice of law both so demanding and so gratifying: it places a difficult challenge before counsel and at the same time enables counsel to transcend what are, too often, the tawdry standards of commercial conduct. Semien breached that duty. He did not even consult his former clients, much less obtain their written consent, and defendant inexplicably permitted him to do so. The standards of ethical conduct for the legal profession and in the Central District of California cannot condone such behavior.

For all the foregoing reasons, plaintiff Low's motion to disqualify the Legal Unit is GRANTED.

### *Transition and Scheduling.*

At the hearing, counsel for Low conceded that there is no evidence in the record that Messrs. Adkins or Fassler have in fact obtained confidential information, and (as noted above) they represent that they have not. There is, therefore, no impediment to their participating in an unfettered manner in transferring to successor counsel all of their work product, including their views, strategies, notes and all aspects of case preparation.

Also at the hearing, counsel for defendant informed the Court that the Office of the California Attorney–General will be given the opportunity to take over the representation of defendant and, if it does not assume that responsibility, a private law firm will be retained. Either way, the consequence of disqualification (regretta-

However, *Younger* is still instructive for the underlying principles which it articulates.

bly) is that the looming trial date (just one week away) will be significantly delayed.[17]

The Court orders that within 45 days from the date of this Order defendant shall file a substitution of counsel. Promptly thereafter, the Court will schedule a status conference, at which time it will set a firm trial date, probably for between 60–90 days after the status conference.

IT IS SO ORDERED.

17. Counsel for both plaintiffs stated that they were prepared to accept that delay.