**UNITED STATES of America, Plaintiff,**

v.

**Kenneth KETNER, Defendant.**

**No. SACR05–36JVS.**

United States District Court, C.D. California.

May 12, 2005.

---

Andrew D. Stolper, Assistant United States Attorney Santa Ana, CA, for Plaintiffs.

Thomas H. Biernert, Jr., San Clemente, CA, for Defendants.

*Memorandum re Motion to Disqualify*

SELNA, District Judge.

On this Motion, Defendant Kenneth Ketner ("Ketner") seeks to disqualify Assistant United States Attorney Andrew Stolper ("Stolper") on the ground that Stolper worked in the Century City office of Irell & Manella LLP ("Irell") at the same time Irell's Newport Beach office represented Ketner in a bankruptcy resulting from the demise of Mortgage Capital Resources ("MCR"). The current prosecution is related to Ketner's activities at MCR.

This case raises two issues. First, does a general application of California's ethics rules require disqualification of Stolper? Second, is there a second, higher standard which requires disqualification of a government prosecutor solely on the basis of the appearance of conflict? As discussed below, the Court finds that application of standard ethical rules does not require disqualification. Assuming there is a second, higher standard applicable to prosecutors, the Court finds Stolper's prosecution of Ketner does not raise an appearance of conflict justifying disqualification.

The Court conducted oral argument on April 25, 2005, and invited the submission of further evidence concerning Stolper's dealings with additional attorneys at Irell who worked on Ketner's bankruptcy. The Court has considered this material, as well as Ketner's supplemental brief.

I. *Application of General Principles.*

In the last thirty years, the private practice of law has changed dramatically, and

the California decisions treating ethics issues have recognized the fact. In *Adams v. Aerojet–General Corp.*, 86 Cal.App.4th 1324, 1336, 104 Cal.Rptr.2d 116 (2001)[1], the Court of Appeal dealt with the role imputed disqualifications in today's legal world:

> Disqualification based on a conclusive presumption of imputed knowledge derived from a lawyer's past association with a law firm is out of touch with the present day practice of law. Gone are the days when attorneys (like star athletes) typically stay with one organization throughout their entire careers. Partners with one law firm may join a competing firm or splinter off and form their own rival firm; former defense lawyers may become plaintiffs' specialists and vice versa; ... *Individual attorneys today can work for a law firm and not even know, let alone have contact with, members of the same firm working in a different department of the same firm across the hall or a different branch across the globe.*

(*Id.*; emphasis supplied.)

■ In today's world, the fact that a lawyer who has changed firms once worked at a firm which represented his opponent will not result in disqualification unless that there is a "possibility that the firm-switching attorney had access to confidential information while at his or her former firm that is related to the current representation." *Id.* at 1340, 104 Cal. Rptr.2d 116; *accord Jessen v. Hartford*

*Casualty Ins., Co.* 111 Cal.App.4th 698, 711–13, 3 Cal.Rptr.3d 877 (2003). Here the uncontroverted record negates such a finding.

■ First, Stolper never worked on Ketner's bankruptcy. (Stolper, ¶ 5; Lobel Decl., ¶ 8.) Nor did he even work in the bankruptcy department.[2] (Stolper Decl., ¶ 3.)

Second, Stolper worked in Irell's Century City office, not the Newport Beach office where the Ketner representation was centered.

Third, Stolper was virtually unknown to the Irell lawyers who worked on Ketner's bankruptcy. Following the initial hearing, the Court directed the Government to supplement its showing by submitting additional declarations from each person at Irell who spent more than 50 hours on Ketner's representation. (*See* Ketner's Reply, Ex. D.) The declarations now before the Court cover individuals who account for 97% of the time spent by Irell on the matter. Those declarations show:

- Eight of the 12 lawyers and paralegals never met or communicated with Stolper.[3] Among those to whom Stolper was unknown was the only lawyer in the Century City office who spent substantial time on the Ketner bankruptcy.[4]
- One lawyer did not meet Stolper until after Stolper had left Irell, and the encounter was purely social.[5]
- One lawyer, who worked in the Newport Beach office, met Stolper at a new

---

1. *Aerojet* was authored by Ninth Circuit Judge Conseulo Callahan while she served on the California Court of Appeal.

2. That the converse may be true here-lawyers in departments other than bankruptcy worked on the Ketner representation (Ketner Reply, pp. 9–10)–does not negate the point.

3. Berger Decl., ¶ 4; Pinon Decl., ¶ 3; Licata Decl., ¶ 3, Good Decl., ¶ 3, Steinberg

Decl.,¶ 3; Kennedy Decl., ¶ 3; Frimmer Decl., ¶ 3, Lobel Decl., ¶ 6.

4. Berger Decl., ¶ 4. Frimmer, Kennedy, and Steinberg, the other attorneys in the Century City office with time on the matter, spent at total of 2.5 hours. (Ketner Reply, Ex. D.)

5. Sayres Decl., ¶ 2.

associates retreat, and ran into him socially at firm events, but never discussed the Ketner matter.[6]

• Only two lawyers had actually worked with Stolper. John Wagner knew Stolper from a matter which pre-dated Irell's bankruptcy representation of Ketner.[7] Wagner never discussed the Ketner engagement with Stolper.[8] Harry Schultz had worked on the matter.[9] He spent 1.6 hours on the Ketner representation, and never discussed the matter with Stolper.[10]

From the perspective of *Adams*, it hardly comes as a surprise that as a junior associate Stolper either never met or never appeared on the professional radar screen of the attorneys who worked on Ketner's bankruptcy, save for Wagner.

Two other factors bolster the conclusion that Stolper was not exposed to the Ketner bankruptcy while at Irell. The records for the engagement were maintained in Newport Beach, not Century City where Stolper worked.[11] (Berger Decl., ¶ 3.) Stolper never worked in an administrative position where his duties would have intersected with the Ketner engagement. (Stolper Decl., ¶ 3.) While the ebb and flow of lawyers among departments and offices may be a reality of today's practice in large law firms (Ketner Reply, pp. 8–10), it is clear that Stolper never had any access to confidential information. The protection of

client confidences is the principal value when dealing with a case involving successive representations, and the Court is satisfied on this record that that value has not been sacrificed here. *Flatt v. Superior Court*, 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994).

■ Ketner seeks to avoids the effects of this showing on the assumption that there is a free flow of information in large law firms and government agencies. However, the cases making that observation do so in a different context: An attorney bringing confidential information to a new firm will cause that information to be imputed to the new firm in a conflicts analysis. *People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal.4th 1135, 1153–54, 86 Cal. Rptr.2d 816, 980 P.2d 371 (1999); *Andric v. State of California*, 55 F.Supp.2d 1056, 1056, 1058 (C.D.Cal.1999)(state agency in-house legal department).[12] These cases do not hold that an attorney departing a firm will automatically be presumed to have confidential information which his former firm holds. There are several reasons for distinguishing the two situations.

First, when an attorney with actual confidential information comes to his new firm, he is in fact in daily contact with his colleagues, and there is an on-going opportunity-either intentionally or inadvertently-to divulge confidential information. An at-

---

**6.** Djavaherian Decl., ¶¶ 2–4.

**7.** Wagner Decl., ¶ 3.

**8.** *Id.* ¶ 4.

**9.** Schultz Decl., ¶ 3.

**10.** *Id.* ¶¶ 2, 4.

**11.** There is no evidence that Stolper was ever exposed to the three or four boxes of documents which Berger reviewed in the Century City office, and then returned to the Newport Beach office. (Second Berger Decl., ¶ 3.)

**12.** Similarly, the cases cited by Ketner in his reply that specifically discuss prosecutors' ethical obligations are cases of an attorney bringing confidences to the prosecutors' office. *City of Santa Barbara v. Superior Court*, 122 Cal.App.4th 17, 20, 18 Cal.Rptr.3d 403 (2004); *City and County of San Francisco v. Cobra Solutions, Inc.*, 119 Cal.App.4th 304, 14 Cal.Rptr.3d 400, 402 (2004), review granted and depublished, cited at Ketner's Reply, pp. 2–3. The Court notes that the lengthy quotation from Ketner's reply is from the depublished opinion.

torney who departs with no confidential information has no such opportunity. Second, from the standpoint of judicial supervision of the Bar's ethical obligations, it is a much easier task to consider the factual dispute as to whether the departing attorney does or does not have confidential information than to attempt to supervise prospectively safeguards put in place at the new firm to ensure that an attorney with confidential information does not breach his duty at the new firm. Said another way, it is easier to examine a static situation than to police a dynamic one. One situation requires a *per se* rule; the other does not. (*See id.* at 1069 ("There is something more than an attorney switching sides here—and that 'something' presents too great a concern to be dispelled by an ethical wall").) In essence, this is the teaching of *Adams.*

Whatever may be said for assessing the appearance of conflict when a lawyer moves to another firm, *Trone v. Smith,* 621 F.2d 994 (9th Cir.1980), it is not the standard today at least as applied to lawyers in private practice.[13] *See* cases cited in Government Opposition, pp. 14–15.

At the initial oral argument, Ketner urged the Court to analyze this case as one of "side-switching" on the theory that the criminal prosecution is an extension of the bankruptcy. Just as Stolper could not have jumped to the creditors' side of the bankruptcy and litigated against Ketner, so here he ought to be barred from the criminal prosecution. The argument itself points up the first flaw: The criminal prosecution is not the bankruptcy. Particularly where Stolper has no confidential information, there is no reason to extend the concept of side-switching.[14]

II. *Prosecutors and the Appearance of Impropriety.*

■ Ketner argues generally that the United States Attorney should be held to a higher standard than the private practitioner because of the public nature of her duties. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Ketner notes specifically that United States Attorney's Manual requires recusal where "there is an appearance of a conflict of interest or loss of impartiality." USAM, § 3–2.170, cited at Ketner Motion, p. 4. Assuming that an appearance of conflict will disqualify an Assistant United States Attorney,[15] the Court finds none here.

Ketner asserts that *Preston v. United States,* 923 F.2d 731 (9th Cir.1991), offers persuasive authority for the proposition that an attorney without confidential information brings with him by imputation any taint his firm possesses. There Judge Letts unquestionably moved from a firm with confidential knowledge to the Bench. While the recusal statute, 18 U.S.C. § 455(a), speaks to circumstances where the judge's "impartiality might reasonably be questioned," the case did not turn on general appearances.[16] Rather, the statute contained a specific prohibition against handling matters where lawyers "with whom [the judge] previously practiced law

---

13. Even if credited at face value, *Trone* dealt not with an attorney who changed firms, but the same firm's subsequent adverse representation. Moreover, *Trone* recognizes that disqualification is not warranted where an attorney changing firms had no knowledge or involvement in his prior firm's representation which might create a conflict. *Trone v. Smith,* 621 F.2d 994, 998 n. 3 (9th Cir.1980).

14. *See* the discussion of *United States v. Schell* in the next section.

15. Ketner cites no case standing for the proposition that appearances alone compel disqualification of a prosecutor.

16. "We need not explore whether an appearance of partiality existed in this case." *Preston,* 923 F.2d at 734.

during such association" were involved. (923 F.2d at 733, *citing* 18 U.S.C. § 455(b).) There is no basis for imposing such a statutory exclusion on a prosecutor with no confidential information.

The briefest recitation of the facts in *United States v. Schell,* 775 F.2d 559, (4th Cir.1985), upon which Ketner heavily relies, makes the precise distinction which Ketner seeks to avoid here:

> We conclude that due process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter. Because [AUSA] Jividen represented Wilson and Cain concerning the very matter about which he later helped to prosecute and convict them, we are compelled to reverse their convictions and dismiss the indictment as to them. On the other hand, Jividen did not serve as counsel to appellants Schell and Stevens. Thus, no attorney-client relationship existed between them. Furthermore, there is no evidence that Schell and Stevens were in privy with Wilson and Cain or that Wilson and Cain imparted to Jividen any confidential information regarding Schell and Stevens. We, therefore, hold that neither Schell nor Stevens has demonstrated any prejudice as a result of Jividen's participation in this case which would require reversal of their convictions.

(775 F.2d at 566; footnote deleted.) Unlike AUSA Jividen who had formerly represented two defendants, Wilson and Cain, Stolper never represented Ketner. Morever, where Jividen did not represent the other two defendants, Schell and Stevens, the Court was not willing to assume that he had these two defendants' confidential knowledge. Similarly, there is no basis here to assume that Stolper had Ketner's confidential knowledge while working at Irell. Appearances were not enough to overturn the convictions of the defendants whom Jivden had not represented. They are not sufficient to support disqualification here.

The additional authorities marshaled in Ketner's supplemental brief are inapposite. In *People v. Conner,* 34 Cal.3d 141, 148, 193 Cal.Rptr. 148, 666 P.2d 5 (1983), the entire Santa Clara County District Attorney's Office was recused where a deputy district attorney was a witness to and potential victim of a court house shooting. There is no analogue here. In *United States v. Grande,* 620 F.2d 1026, 1030 (4th Cir.1980), the United States Attorney recused himself where his former firm had represented the criminal defendant, he had received campaign funds from the defendant in an earlier election, and his sister was active in opposing the zoning issue which figured in the case. Stolper does not have similar impedimenta.

### III. *Practical Considerations.*

Ketner urges the Court to put aside practical or policy considerations in favor of preserving the public trust. (Ketner Reply, p. 11.) As indicated above, the Court does not believe the public trust is in danger. Given that it is not, Court sees no point in creating insuperable problems for lawyers-whether public or private-who make career changes. *Adams* summarizes the problems with the rule Ketner espouses:

> A rule under which a nonrebuttable presumption of imputed knowledge from an attorney's former firm follows him to whichever firm he subsequently joins would also pose insurmountable practical problems in screening for conflicts. When an attorney joins a new law firm, he normally discloses the names of former clients who will create a conflict for the new firm if it takes the opposing side in future litigation. But there is no way, when an attorney joins a new firm, that

he or she can provide that new firm with notice of "imputed knowledge"-that is, names of clients and the nature of their matters the attorney never knew about or worked on while at the former firm. Application of the imputed knowledge doctrine under these circumstances would mean that the attorney's association with the new firm would automatically subject him and the new firm to disqualification without anyone knowing it.

*Adams*, 86 Cal.App.4th at 1336, 104 Cal. Rptr.2d 116. This Court agrees.

IV. *Conclusion.*

The Motion is denied.